838

## MANCHESTER BOARD & PAPER CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3719.

Circuit Court of Appeals, Fourth Circuit.
Jan. 8, 1935.

Henry C. Riely, of Richmond, Va. (McGuire, Riely & Eggleston, of Richmond, Va., on the brief), for petitioner.

A. F. Prescott, Sp. Asst. Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER, NORTHCOTT and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The petition in this case brings up for review a decision of the Board of Tax Appeals wherein the taxpayer was required to account for, as income for the year 1928, the entire sum of $58,000 received by it for the relinquishment of its rights as lessee of certain land; and its contention that no profit accrued to it thereby was overruled. The lease had its origin on December 4, 1865, in a transaction between the trustees of the town of Manchester, later a part of the city of Richmond, Va., and a partnership known as the Manchester Paper Mill Company, whereby the trustees leased to the firm a strip of the town common 125 feet wide, extending from the James river to a street bordering on a canal that belonged to the town. The term of the lease was fifteen years from October 1, 1863; the lessee agreed to pay an annual rent of $1,200, and to perform certain other obligations immaterial to this discussion; and it was provided that at the end of the term, the lease should be renewed for a like term of fifteen years, and so on, at the end of each successive term; provided, that upon the expiration of any such term, the trustees might fix upon and demand increased rent which the lessee should pay or otherwise surrender the lease and improvements to the trustees, upon payment by them of the actual valuation of the improvements erected by the lessee, no regard being had in making the valuation to the advantages of the site or the privileges and appurtenances thereto belonging.

By virtue of an earlier agreement between the parties made in contemplation of the lease, buildings, machinery, and fixtures suitable for the manufacture of paper by water power had already been erected on the land; and the lessors agreed to supply for the use of the firm 300 square inches of water to be drawn from the canal at a pressure of 3 feet above the center of the aperture, through which the water was to be taken, the water power to embrace a head and a fall altogether of 18 feet 6 inches. The lease was subsequently renewed by the parties thereto and their respective successors in title at fifteen year intervals without change. The Virginia Railway & Power Company succeeded to all the rights and obligations of the original lessors; and in 1909, during the renewal term beginning October 1, 1908, the taxpayer purchased the property of the lessee for $25,000 at a public sale held pursuant to an order of court, and was given a deed on March 31, 1910, whereby it acquired the lease of December 4, 1865, with the right of renewal therein provided, all interest and estate in the land and water rents therein demised, and all right, title, and interest of the preceding lessee in the mill, building, machinery, and fixtures on the demised premises. No entry was made on the taxpayer's books of the value of the lease upon its acquisition, and it seems to be conceded that nothing was paid for it at the forced sale of the assets of its predecessor in title. The taxpayer has since been engaged in the manufacture of paper products on this site. On April 2, 1910, the taxpayer and the Power Company entered into an agreement which recognized the former as lessee, and provided for a renewal of

the original lease from October 1, 1908, to October 1, 1923, without change in terms.

In 1923, the lease was renewed for an additional term of fifteen years from October 1, 1923, at the increased rental of $4,000 per annum, but without other change. Thereafter, the parties became involved in litigation concerning the interpretation of the lease, and their differences were settled by an agreement, under which the lease of December 4, 1865, was canceled, the water rights thereunder were surrendered to the lessor and the land under lease was transferred by deed from the lessor to the lessee, and the compensation to be paid to the lessee was fixed by arbitration. The Board of Arbitration stated in their opinion that the amount of power under the lease was 100 net horse power; that the settlement should be on a basis of a perpetual rather than a fifteen year lease; and that a fair compensation for the cancellation of the lease was the sum of $70,000, of which $12,000 was determined to be the value of the hydro plant of the lessee and $58,000 the value of its rights under the lease. This amount was paid to the taxpayer in 1928, and the land was accepted as part payment thereof.

Upon these facts, it was conceded by the parties before the Board that the case should be decided in conformity with the terms of sections 111 (a) and 113 (b) of the Revenue Act of 1928, 45 Stat. 791, 815, 818 (26 USCA §§ 2111 (a), 2113 (b), which provide, as to a case of this sort, that the basis for determining the gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be the cost of such property or its fair market value on March 1, 1913, whichever is the greater. The Commissioner, in computing the taxpayer's income for 1928, added the sum of $48,000 as profit derived from the settlement with the Power Company, determining that the value of the water rights on March 1, 1913, was $10,000. The taxpayer appealed to the Board, asserting that the value of the leasehold and water rights was then far in excess of this figure. The Commissioner, in his original answer filed on March 18, 1931, made a general denial. Subsequently, in the course of the hearing before the Board on December 7, 1932, the Commissioner, notwithstanding his previous determination, filed an amended answer in which he asserted that the water rights had no value on March 1, 1913.

At the hearing before the Board, the taxpayer produced a hydraulic engineer of long experience, who testified as an expert that in his opinion the water rights under the lease were worth $75,000 on March 1, 1913, for the reason that the lease contained "a continuing perpetual feature known as a water right" that could be enjoyed only on the site. Two expert witnesses were examined on behalf of the Commissioner, one of whom testified that on March 1, 1913, the lease had a bonus value to the lessee of $10,000 because it provided for a rental of $1,200 per annum, whereas 100 horse power was worth $2,000 per annum at that time, and that the difference of $800 should be capitalized at the sum of $10,000. The witness added that if such a lease expired in 1923, with the provision for renewal left out, and the rental then to be fixed, it would have had no bonus value on March 1, 1913. Another witness for the Commissioner valued the water right as of March 1, 1913, at an annual rental of $2,500, and arrived at a bonus value of $13,000 for the lease on the assumption that the lease was in perpetuity. He added that if it were subject to renewal at a fair rental ten years later in 1923, its value on March 1, 1913, would be very little.

The Board of Tax Appeals held that the evidence on both sides as to the value of the lease on March 1, 1913, was immaterial to the decision of the case, and consequently made no finding of fact in this respect. It pointed out that the taxpayer paid nothing in 1909 for the leasehold which it sold in 1928, and hence it was important to determine whether the property sold, or any part of it, had been acquired by the taxpayer before March 1, 1913, for otherwise the whole proceeds of the sale became income in the taxpayer's hands. It concluded that the taxpayer had not shown either the existence or the value in 1913 of any right sold in 1928. Assuming that the lease did have a value on March 1, 1913, in excess of the annual rental, and that the lessor could not refuse to renew the lease, it held that the evidence did not show the separate value of the renewal privilege. It thought that the March 1, 1913 value consisted principally, if not entirely, of the excess worth of the privileges accorded to the lessee over the rental which it had to pay; and that it was clear in 1913 that this element of value would completely disappear on October 1, 1923, the end of the term then in effect, for when this occurred, the lessor might be expected to demand the full worth of its property as rental for the next period. So it was held, in the absence of evidence show-

ing the separate value of the renewal privileges in the lease on March 1, 1913, that for the purpose of computing the taxpayer's income in 1928; the whole property then sold must be considered to have been valueless on the earlier date.

In this conclusion, we think that the Board was in error. It was reasonable to conclude that the lease cost the taxpayer nothing in 1909; but not that the renewal feature of the lease sold had no existence or value in 1913. The experts were agreed that the leasehold then had a substantial value in excess of the rent which the lessee was obliged to pay. The taxpayer's expert obviously included in his appraisal a large sum for the value of the renewal privilege. One of the experts for the respondent conceded some slight value to this feature of the lease; and the other seems to have valued the lease with the renewal privilege out. Both experts for the respondent were impressed by the fact that the lessor had the option to increase the rent at the end of any fifteen year period, and attributed little value to the right of the lessee to perpetual renewal, or, in the alternative, to demand payment for the value of its plant. Nevertheless, this covenant in the lease may not be ignored. Undoubtedly the value of the leasehold at any point of time after 1863 would have been greatly influenced by a comparison of the rental value of the water right, with the rental specified in the lease; but the right of renewal, restricted though it was, would also have had a substantial bearing. As a matter of history, successive lessees held the property from 1865 to 1923 under a rental, which, for at least part of the time, was less than its actual value, and it cannot be doubted on the record before us that the renewal privilege, guarded as it was by the obligation of the lessor to take and pay for property for which it might have had no use, contributed in some measure to this result.

The right of renewal which was given life in 1865 was not destroyed by the increase of rent in 1923. It still persisted; and although the amount paid for the cancellation of the lease in 1928 must have been affected in great part by the fact that the lease then current had ten years more to run, it must also have been influenced by the consideration that even at the end of that time, the lessor had no certainty of recovering the property without paying the value of a specialized plant or without the delay and expense of litigation that might ensue. The perpetual character of the renewal privilege distinguishes this case on the facts from Bonwit Teller & Co. v. Commissioner (C. C. A.) 53 F.(2d) 381, 82 A. L. R. 325, on which the respondent relies.

In our opinion, the renewal privilege was the one thing of value in existence in 1913 which the taxpayer sold in 1928; and if its value in 1913 had been shown by substantial proof, the amount should have been deducted from the proceeds of sale in order to show the profit which the taxpayer received. The Board seems to have been of like opinion; but as the evidence did not disclose a separate valuation, it was held that the taxpayer had failed to carry the burden of proof imposed upon it. We think, however, that the determination of the Commissioner, the course of the pleadings and of the proof, were such as to lead the taxpayer to suppose that a separate valuation of this privilege was not required. The determination of the Commissioner was made and the case was tried largely on the theory that the profit was to be estimated by the difference between the value of the leasehold on March 1, 1913, and its value on the date of sale, without segregation of the several elements entering into the leasehold; and it was not until the decision of the Board that the importance or necessity of a separate valuation was made clear. In this situation, the proper action for the court is to set aside the decision of the Board and to remand the case in order that the taxpayer may have an opportunity to present the necessary proof, so that it may be determined what value, if any, the renewal privilege had on the basic date. See Underwood v. Commissioner (C. C. A.) 56 F.(2d) 67; Eau Claire Book & S. Co. v. Commissioner (C. C. A.) 65 F.(2d) 125; Taylor v. Commissioner (C. C. A.) 70 F.(2d) 619.

Reversed and remanded.

NORTHCOTT, Circuit Judge (dissenting).

I cannot concur in the above opinion, for the reason that I have reached the conclusion that the lease for which the petitioner was compensated in the year 1928 had no existence, either real or potential, in the year 1913, and could, therefore, have had no value in the latter year. That which was in existence in the year 1913 was an entirely different lease, and expired, at the end of the fifteen-year period, in 1923. The lease sold in 1928 had its origin in 1923, and was

for a different rental from the lease in existence in 1913.

The perpetual right of renewal upon terms fixed by the lessor at the expiration of each period could have no actual value. The right to accept or reject the new rate of rental to be fixed by the lessor, and in the fixing of which the lessee had no voice, would be more than offset by the danger of the winding-up of the lessee's business if the rental terms were not satisfactory and the lease surrendered. The condition of the lease giving the lessor the sole right to fix the rental rendered the right to renew practically valueless.

Even if it be admitted that the right of perpetual renewal had a value, no evidence was offered before the Board of Tax Appeals as to what that value was. The taxpayer was put upon notice, when the respondent filed his amended answer before the Board, that it would be contended that the water rights had no value in 1913, yet no evidence whatever was offered on this point. I do not think it can be reasonably claimed that the taxpayer was taken by surprise. The petitioner was seeking relief; it was its duty to sustain the burden of making a case. It did not do so. I cannot see how the Board could have acted other than it did, and I am therefore of the opinion that the decision of the Board of Tax Appeals should be affirmed.